■
## Fred URBETEIT, Claimant of 16 Articles of Device, more-or-less, labeled "Sinuothermic", etc. v. UNITED STATES of America.

### No. 12033.

United States Court of Appeals
Fifth Circuit.

August 2, 1949.

Rehearing Denied Sept. 13, 1949.

H. O. Pemberton, Tallahassee, Fla., for appellant.

George Earl Hoffman, U. S. Atty., Pensacola, Fla., Vincent A. Kleinfeld, Atty. Dept. of Justice, Washington, D. C., John T. Grigsby, Atty. Dept. of Justice, Washington, D. C., for appellee.

Before HUTCHESON, SIBLEY, and HOLMES, Circuit Judges.

### PER CURIAM:

The motion to affirm is granted. U. S. v. Urbuteit, 69 S.Ct. 840.

SIBLEY, Circuit Judge (dissenting.)

My brethren feel compelled by the opinions of the Supreme Court in this case to grant the Government's motion to affirm the decree of the District Court forfeiting the sixteen electric machines seized as misbranded. The last mandate does not direct us to affirm. If it did, the full responsibility for a wrong decision would be on the Supreme Court. It remands the case to us for further proceedings in conformity with the opinions of the Supreme Court, and this remand requires us to exercise a judicial and not a ministerial function. To join in the affirmance would make me feel both foolish, and false to my judicial oath to support the Constitution of the United States which I think is being violated. This bold statement needs to be justified.

The second amended libel describes the machines as "numbered X8 and X10 of the so-called Master Type, the others bearing numbers T20, T23, (naming 14), of the so-called Treating Unit Type." Dr. Kelsch filed a claim to the machines X8, X10, T20, T25, T26, and T32. Dr. Fred Urbeteit disclaimed any interest in these six, having sold them to Dr. Kelsch, but he filed a claim to the remaining ten T-Type machines which he alleged he had rented to Dr. Kelsch. The evidence is clear that the ownership was as stated. It is also clear that the Master Type machines alone have voltmeters and milliampere meters and dials for reading them, and that this type alone is used by the practitioner in diagnosing. The Treating Type machines are for use by patients and have nothing to do with diagnosing. Assuming the fals-

ity of statements in the "Road to Health" as to capacity to diagnose, these statements relate only to the diagnosing machines. The false statements as to successful treatment relate only to the Treating Type. The difference is like that between X-ray machines which take photographs for diagnosis and those which apply such rays to the patient in treatments. The district judge, in paragraph 3 of his findings of fact, distinguishes the two types of machines and their use; and in paragraph 5 he deals with the Master Type machines and their use in diagnosing, and concludes: "The Master Machine therefore is incapable of diagnosing any diseased condition." In paragraph 6 he turns to the question of therapeutic and curative effects and finds, on the incomplete evidence before him, that no such effect is or can be produced. He therefore condemned all the machines.

Dr. Kelsch did not appeal his case. His 6 machines stand condemned, including both the X8 and X10 Master Type Machines. Urbeteit appealed, and his ten Treating Type rented machines alone are now before this court. No one has ever represented that the treating type machines were useful in diagnosing. The evidence as to usefulness in treatment has not been fully heard, thirty witnesses for Urbeteit being present and ready to testify, but excluded for a reason this court has held to be insufficient. It must be assumed, on this motion to affirm for false statements as to diagnosis only, that these ten machines are useful for treatment, the purpose for which they are intended. It therefore seems to me foolish to say that because Urbeteit sold two Master Type Machines to Kelsch which were mislabeled as to diagnostic powers, he forfeited also ten machines of another kind which he later rented and shipped to him.

The skimpy but uncontradicted evidence as to the printed leaflets, "The Road to Health", is that before buying his first machines Dr. Kelsch asked Dr. Urbeteit to send him some copies, and some were sent by mail about Sept. 1, 1945, and mailed out by Dr. Kelsch to some of his patients. Machines had been shipped July 25, Aug. 14, and August 18, 1945. The last three were shipped Sept. 21, 1945. It does not appear whether these shipments were on separate orders. The Supreme Court, without evidence or a finding by the district judge, has said they were a "single interrelated activity" with the sending of the printed leaflets. I suppose that we are to understand that all re-orders of foods, drugs, cosmetics and devices are forfeited if the first lot be falsely labelled. This would be in keeping with the holding that these leaflets "accompanied" any of these machines. They did not. The forfeiture of these devices, good or bad, would be impossible except for the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 334, providing for forfeiting of "Any * * * device, * * * that is * * * misbranded * * * while in interstate commerce." Misbranding includes false labeling. Section 321(m) declares "The term 'labelling' means all labels and other written, printed, or graphic matter (1) *upon* any article or any of its containers or wrappers, or (2) *accompanying* such article." (Emphasis added.) The printed matter here is said to have accompanied these machines "while in interstate commerce" because it was mailed to the same person several weeks after some of the machines were sent and several weeks before others. The only interstate commerce in which the machines ever were was their transportation from Florida to Ohio, in four separate express shipments. No machine was in interstate commerce except during its transportation. All but three had arrived and been delivered in Ohio from two weeks to six weeks before any printed matter was started. How could they be thereby "misbranded" while in interstate commerce?

"Accompanying" is a plain English word wholly unambiguous. It was used by Congress *to define,* not *to be defined.* It defines not only a *forfeiture* but also a *crime.* What it means in forfeiting property it also means in forfeiting liberty in a criminal prosecution under the statute. All the dictionaries I have seen say it means "to go along with". They say also it is used in music, but who would think

a pianist "accompanies" a soloist, if he performs an hour before or after? I surely do not "accompany" another on any trip if I either precede or follow by a space of weeks. The courts here are adding words to the definition made by Congress, and making it read "accompany, or precede or follow in an inter-related activity". And an "interrelated activity" is badly in need of definition itself. To thus amend a plain statute is to legislate, and for the courts to do it is to violate the very first sentence in our Constitution: "All legislative powers herein granted shall be vested in the Congress of the United States, which shall consist of a Senate and House of Representatives." The courts have no right to alter a statutory definition; or otherwise try to make a tighter law than Congress has made. Sworn to uphold the Constitution, judges ought to be careful about engaging in judicial legislation. I can accomplish nothing here, but I feel bound to protest. I am not concerned so much about Dr. Urbeteit and his machines, which may be worthless or worse, but I am greatly concerned about unlawful perversion of the statutory law.

Rehearing denied; SIBLEY, Circuit Judge, dissenting.